Filed 6/3/26  P. v. Bobila CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084211 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN435057) |
| CHRISTIAN BOBILA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Anthony J. Campagna, Judge.  Affirmed as modified.

Ronda G. Norris, under the appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Collette C. Cavalier and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

Christian Bobila killed his father- and brother-in-law following a years-long family dispute. A jury convicted him on two counts of first degree murder, and the court sentenced him to two consecutive life terms in prison without the possibility of parole. On appeal, he claims the prosecution failed to disprove that the murders were the result of extended provocation and thus he should only have been convicted of second degree murder. We disagree and find the evidence of premeditation and deliberation was sufficient to find first degree murder as to both victims.

Bobila also argues the court erred by imposing a $10,000 parole revocation fine even though he is not eligible for parole. The Attorney General concedes this fine should be stricken. We agree with the parties and strike the fine. As so modified, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*

Bobila began dating his wife, Lylah, in 2007. Lylah lived with her mother (Carmelita Reyes), her father (Vicent Reyes), and her brother (Vince Reyes) in north San Diego County.[1]

For many years, Lylah had been instrumental to supporting her family by working at a company called Primerica. Carmelita began working with Primerica in the 1980s, and Lylah began working for her mother while she was still a teenager. Primerica earnings are entirely commission-based. Salespeople recruit others to sell Primerica products and then can receive additional commissions based on those recruits' sales. The subordinate

---

[1] Because several individuals share the same last names, we refer to parties by their first names to avoid confusion. No disrespect is intended.

2

salespeople recruit more salespeople, and a portion of all the commissions funnel up to the top of the salesperson pyramid. The entire pyramid works under a specific commission code that is owned by the original salesperson. That code can be sold by the owner. Carmelita developed a valuable business under her Primerica commission code, principally through Lylah's sales efforts.

Lylah described an abusive and controlling dynamic with her mother, claiming she had to drop out of college and work long hours to pay off Carmelita's debts and support Vince. Carmelita controlled all of Lylah's earnings, which were deposited into Carmelita's account.

Carmelita was displeased when Lylah began dating Bobila, as she thought it was distracting Lylah from work. She further disapproved of Bobila, who made less money than Lylah and came from a different Filipino ethnic group than Carmelita's family. Carmelita nonetheless "ordered" Bobila to move into her home in 2009. Although Bobila was living in her house, Carmelita did not acknowledge his presence for four years. Bobila attempted to please Carmelita, but she continued to ignore and belittle him, calling him a "maid" and refusing to meet his relatives when they visited from out of town. When Bobila began selling Primerica products under Carmelita's code, Carmelita would disparage him at work as well, "boo[ing] him" in front of colleagues. Nonetheless, Lylah said Bobila never got mad or yelled at Carmelita.

Carmelita's financial expectations of Lylah led her to delay marriage. But in 2019, Bobila and Lylah decided to get married despite Carmelita's disapproval. Carmelita revoked Lylah's access to their shared bank account the day before the couple left on their honeymoon. When she returned, Lylah and Bobila discovered they had been locked out of their business office. Vince

3

and Carmelita then excluded Lylah from Carmelita's commission hierarchy, which Lylah described as being "disowned." Lylah and Bobila had to "start over," building a new independent Primerica "team."

In February 2022, Lylah and Bobila decided to move in with Bobila's parents in the Bay Area. That same month, they returned to Carmelita's home and discovered that all the locks and entry codes had been changed. After that, Lylah did not see or speak to her brother or father for several months. She testified that Bobila had not spoken to her brother, father, or mother since October 2021.

In June 2022, Bobila and Lylah planned to attend a Primerica convention in Atlanta, which Carmelita would also be attending. They originally planned to drive down to San Diego, spend the first night with friends, stop briefly at Carmelita's home, spend a second night in a hotel, and fly to Atlanta the following day. Shortly before they left, however, Bobila and Lylah changed plans and decided to stay overnight at Carmelita's home the night they drove down.

Lylah testified that Bobila brought a gun "[a]ny time we do long drives. Because COVID, we did 6 states; California, Oregon, Washington and back. We did Utah, New Mexico, Texas, South Carolina, all those states. I know he would carry. Any long trips when we would drive [at] night. We would drive long drives." He would not usually tell her if he packed a gun, and she did not know he had brought one with him on this trip. In fact, Bobila had packed a semiautomatic pistol and four magazines, each containing at least ten rounds.

They planned to arrive at Carmelita's home late in the evening to avoid a family argument. According to Lylah, Carmelita told them there would not be food at the house when they arrived, so they picked up tacos. Lylah no

4

longer had the code to get into her parents' gated community, so they waited to enter behind another car. Lylah called Carmelita, who opened the garage so they could get into the house. Lylah and Bobila entered the home and went upstairs to their former bedroom. Lylah did not see what Bobila brought in from the car, but they did not bring their suitcases because they "were leaving early morning" and "were not even going to change." Lylah took her tacos downstairs to eat with Carmelita in her bedroom. Vince's partner, Sally Yu, who was in the home at the time, testified that she heard and saw someone unlock Bobila's car a few minutes after he and Lylah arrived.

Several minutes later, Lylah and Sally both heard a popping sound. Vince was on the phone with another Primerica salesperson when he was shot. The salesperson testified that Vince was whispering "under his breath" to her. She did not hear anyone else speaking to Vince, but she heard "a shriek in the background" and a loud crash before the phone went dead.

Lylah went upstairs and heard her husband and father speaking in "loud voices." She could only make out her husband saying, "three years." Lylah said her memory was hazy, but she testified that she saw her father tip over in his armchair, and said in her statement to police that she saw her husband holding a gun. Carmelita and Sally testified that they heard gunshots inside the house. A neighbor said he heard two sets of gunshots one and a half minutes apart.

Lylah ran downstairs and found her mother and husband in the kitchen. Bobila said, "Vince is dead" or "your son is dead." Lylah said his eyes were "big" and "flickering" like he was "possessed." Bobila then left the house as Lylah pursued him. He told her, "take care of my mom," "I'm sorry,"

and "I'm going to kill myself." He drove away but was apprehended by law enforcement shortly thereafter.

Vince died of gunshot wounds to the head and torso. According to the estimate of one witness, a deputy medical examiner, a shot that entered behind Vince's left ear had been fired from about six to 12 inches away. There were six bullet casings found on the patio. Vicente died from one gunshot wound to the chest and one to the back left side of his head.

## B.    *Procedural Background*

Bobila was charged with two counts of murder in violation of Penal Code[2] section 187, subdivision (a). At trial, the jury was instructed, in part:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death. [¶] … [¶]"

> "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

They were further instructed:

> "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide.

---

[2]    Undesignated statutory references are to the Penal Code.

6

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The jury convicted Bobila of first degree murder on both counts. The trial court sentenced Bobila to consecutive terms of life imprisonment without the possibility of parole and imposed various fines and fees, including a $10,000 parole revocation fine pursuant to section 1202.45.

## DISCUSSION

### A. *Sufficiency of the Evidence*

Bobila concedes the jury was properly instructed as to the mental state required for first degree murder and that the trial court gave an appropriate instruction regarding the effect of provocation. He argues, however, that "the prosecutor failed to present sufficient evidence beyond a reasonable doubt that the years-long provocation that Bobila experienced from [Lylah's] family was insufficient to reduce the murder to second degree murder."

"In reviewing the sufficiency of the evidence to support a jury's verdict finding a defendant guilty of a criminal offense, we apply the substantial evidence standard of review." (*People v. Johnson* (2019) 32 Cal.App.5th 26, 57.) We "view[] the trial evidence in the light most favorable to the prosecution and presum[e] every fact the jury could reasonably deduce from that evidence." (*People v. Pearson* (2012) 53 Cal.4th 306, 319.) We " ' "must accept logical inferences that the jury might have drawn from the evidence even if [we] would have concluded otherwise." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 811–812.) "Reversal … is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

7

"If [a] murder is 'willful, deliberate, and premeditated,' it is first degree murder. [Citation.] ' " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " ' " (*People v. Morales* (2020) 10 Cal.5th 76, 88.) Provocation may incite passionate emotions inconsistent with premeditation and deliberation. (See *People v. Nelson* (2016) 1 Cal.5th 513, 541.) "The passion aroused need not be anger or rage but can be any intense emotion, other than revenge." (*People v. Parker* (2025) 113 Cal.App.5th 1261, 1268.) "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

Bobila suggests the evidence can only support the conclusion that he was unable to deliberate or premeditate due to his subjective feelings of deadly passion. He argues he was provoked by years of disrespect from Lylah's family, emphasizing that Carmelita did not speak to him for the first four years they lived together, that Carmelita prevented Lylah from accessing their joint account, and that Vince and Carmelita locked them out of their home and office and excluded them from the Primerica business. Bobila argues his "breaking point was the night of June 26, 2022, when after an eight-hour drive … and informing Carmelita that they were on their way and would be arriving within minutes, he and his wife were forced to wait at the gated entrance of the community until another car entered and to follow that car into the subdivision."

We cannot agree that any reasonable jury would have to conclude Bobila experienced a passion that negated his ability to deliberate or premeditate the murders. Bobila packed a gun and a substantial amount of ammunition in the car, which "indicat[e] he had considered the possibility of a violent encounter" even before arriving at his in-laws'. (*People v. Lee* (2011) 51 Cal.4th 620, 636 (*Lee*); see *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [carrying "the fatal knife into the victim's home in his pocket, [made] it 'reasonable to infer that he considered the possibility of homicide from the outset' "].) It also seems that Bobila first entered the house with Lylah, then returned to the car to retrieve his gun. Even if there are other inferences that could be drawn, the jury could reasonably conclude from this evidence that Bobila planned the murders.

Bobila shot Vince multiple times, including behind the ear from a close range. No one, including the salesperson on the phone with Vince at the time of the shooting, heard any argument or struggle, suggesting that Bobila shot him without warning. The jury could find that this "manner of killing was calm and exacting, supporting a conclusion that it was the result of preexisting thought and reflection rather than an unconsidered rash impulse." (*Lee, supra,* 51 Cal.4th at p. 637; see also *Brady*, *supra*, 50 Cal.4th at p. 565 ["[A]pproaching a prone victim, stopping over him, and then aiming—'shows a calculated design to ensure death rather than an unconsidered explosion of violence' "].)

A few minutes elapsed between Bobila killing Vince and Vicente, giving Bobila additional time to reflect on his decision to kill. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1028 ["The evidence of premeditation and deliberation was particularly strong with respect to [a second victim] murder, because defendant had to travel through the house to reach her after attacking [the

9

first victim] near the front door"].)  Although Lylah heard raised voices, Vicente was sitting down at the time of his death.  Vicente was also shot in the chest and the back of the head, "a manner of killing" indicative of a "deliberate intent to kill." (*Lee, supra,* 51 Cal.4th at p. 637.)  After killing Vicente, Bobila returned to the kitchen and told Carmelita her son "was dead," which could suggest a desire to see her suffer.

Bobila contends that provocation can accrue over a long period, through a "series of events."  (See *People v. Borchers* (1958) 50 Cal.2d 321, 328–329.)  Assuming this is true,[3] the evidence Bobila claims constitutes "provocation" could just as easily be viewed as longstanding motive for a premeditated killing.  (See, e.g., *People v. Lopez* (2018) 5 Cal.5th 339, 355 ["preexisting motive" constitutes evidence of premeditation and deliberation].)  "The mere *possibility* of a contrary finding as to [Bobila's] mental state does not warrant a reversal of the guilt judgment." (*Brady, supra,* 50 Cal.4th at p. 565.)

In any event, Bobila does not point to especially persuasive evidence that his actions were the result of provocation.  He notes that he had never been aggressive or violent before.  But this does not obviously or necessarily support a theory of provocation rather than revenge:  under either theory, he would have unique reason to target his wife's family for violence.  The only claimed "provocation" the night of the murders was Carmelita's failure to provide the gate code to the housing complex, a far smaller slight than many other indignities Bobila suffered at the hands of his in-laws.  It thus does not

_____

3  We note that one court has expressed skepticism that such provocation can occur over the course of many years, as Bobila alleges.  (See *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245 ["[T]he period involved where courts have found provocation over time is nowhere near as long as the 14- or 15-year period during which defendant, according to his sister, was the target of criticism and ridicule by his grandparents"].)

necessarily support an inference that he reached a "subjective breaking point" the night of the murders.  Although he seems to argue this was simply the last straw, Bobila had moved out and had not been in contact with the family for at least four months, creating physical and temporal space from his in-laws' prior behavior.  We therefore do not find Bobila's provocation argument to be compelling.

## B.    *Parole Revocation Fine*

Bobila argues the $10,000 parole revocation fine imposed under section 1202.45, subdivision (a) was unauthorized and must be stricken because he is not eligible for parole.  The Attorney General concedes the error.

Section 1202.45, subdivision (a) provides:  "In every case where a person is convicted of a crime *and his or her sentence includes a period of parole*, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."  (Italics added.)  Under the plain language of the statute, "When there is no parole eligibility, the fine is clearly not applicable." (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.)

Accordingly, we agree with the parties that the parole revocation fine is unauthorized.  We order the trial court to modify the judgment by striking the parole revocation fine. (See, e.g., *People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6.)

## DISPOSITION

The judgment is modified by striking the parole revocation fine and, as so modified, is affirmed.  On remand, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


DATO, Acting P. J.

WE CONCUR:


DO, J.


KELETY, J.